# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

**PROFESSOR RUSSELL STEWART,**

*Plaintiff,*

COURT FILE NO.: _____

v.

**TIMOTHY WALZ, Governor of the State of Minnesota, in his official capacity; PATRICIA ROGERS, President of Lake Superior College (LSC) in her official capacity; LINDA S. KINGSTON, Vice President of Academic and Student Affairs at LCS, in her official capacity; JESTINA VICHOREK, Director of Human Resources at LSC, in her official capacity; NICKOEL ANDERSON, Vice President of Administration at LSC, in her official capacity,**

COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF

*Defendants.*

## INTRODUCTORY STATEMENT

1.      When the Covid-19 vaccines became widely available in 2021, politicians across the nation implemented vaccination requirements (sometimes with frequent testing alternatives) for public employees. These mandates were not based on science, as the evidence at the time did not support the hypothesis that the vaccines arrested transmission of the virus. Yet politicians pursued these scientifically baseless policies in transparent attempts to score political points. It is time that courts recognize that government cannot force medical treatments upon people by making it a condition of employment unless there is a rationale, backed up by at least some scientific evidence, beyond the benefit to the individual. *See Health*

1

*Freedom Def. Fund v. Carvalho*, 104 F.4th 715, 725 (9th Cir. 2024), *reh'g en banc granted*, 127 F.4th 750 (9th Cir. 2025) ("The district court thus erred in holding that *Jacobson* extends beyond its public health rationale—government's power to mandate prophylactic measures aimed at preventing the recipient from spreading disease to others—to also govern 'forced medical treatment' for the recipient's benefit.").

2.      Plaintiff Russell Stewart began his employment as a professor of ethics and philosophy at Lake Superior College (LSC)—a publicly funded community college in the State of Minnesota—in 1992. He attained an unlimited full-time (UFT) position, the equivalent of tenure, a few years later. Until the events that underlie this Complaint, Professor Stewart had no disciplinary record and was respected and liked by both students and colleagues.

3.      In the summer of 2021, Governor Tim Walz of Minnesota issued a Covid-19 vaccine mandate for state employees, requiring them to either get an FDA or WHO-approved inoculation or undergo at least weekly testing (Policy #1446). The ostensible purpose of the mandate was to prevent the spread of the Covid-19 virus, even though the available data indicated that the Covid-19 vaccines were not effective in preventing transmission. The Governor acknowledged that Minnesota State law prevented him from outright mandating the vaccine or Covid-19 testing but said that he believed he could lawfully condition state employment upon compliance with Policy #1446. In other words, Policy #1446 constituted Governor Walz's attempt to work around state prohibitions against mandatory vaccination and testing by utilizing coercive tactics against his own employees.

4.      Professor Stewart did not want to get a new vaccine that had undergone only limited testing. Nor did he want to subject himself to the humiliating ritual of providing bodily

fluids and medical information to the State at whatever frequency his employer demanded, possibly punitively. Therefore, Professor Stewart refused to comply with Policy #1446, and he explained his objections on philosophical grounds to LSC Defendants in writing preceding a series of disciplinary hearings, as well as at the hearings themselves.

5.    After the first disciplinary hearing on September 27, 2021, LSC Defendants placed Professor Stewart on unpaid leave. The same evening, Professor Stewart sent his students an email explaining that he would not be in class because he refused to comply with Policy #1446, which he considered immoral and unlawful. Professor Stewart had not been given any instruction not to contact his students—to the contrary, when he asked at the first disciplinary hearing if he could still use his LSC email address, Defendant Jestina Vichorek stated that no decision had been made yet on that front. About a week later, LSC informed Professor Stewart that he was again the subject of a disciplinary investigation due to his noncompliance with Policy #1446 and because he had violated an explicit order as well as LSC policy by sending an email to his students expressing his personal political opinions. No university policy prohibited (or prohibits) faculty from contacting students in these circumstances or expressing political views to them.

6.    In December of 2021, in the middle of the series of disciplinary hearings addressing Professor Stewart's alleged misconduct, Professor Stewart contracted Covid-19. Despite his explicit request that his naturally acquired immunity provide a basis for exempting him from Policy #1446, LSC refused. When LSC eventually terminated Professor Stewart on March 10, 2022, from his UFT position, his employer cited his refusal to comply with Policy #1446 and the September 27 email sent to his students as the bases for his dismissal. Although

the employee mandate was rescinded a mere six weeks later, Professor Stewart was never offered his job back.

7.     There was no reason to require Professor Stewart to receive a vaccine or submit to incessant testing that entailed providing his employer and the State with private medical information, since the Covid-19 vaccines do not and never did stop transmission of the virus, and Defendants knew or should have known that all along. That was particularly so after he acquired immunity through infection, which scientific evidence has established is superior to immunity induced through vaccination.

8.     By forcing Professor Stewart to submit to vaccination or frequent testing, Policy #1446 violated his right to refuse medical treatment, encompassed by the Fourteenth Amendment's Due Process clause. And by conditioning his continued employment upon his submission to this policy, Defendants created an unconstitutional condition. Similarly, by treating Professor Stewart (once he acquired immunity post-infection) differently from his vaccinated peers, Defendants violated his right to Equal Protection under the Fourteenth Amendment. Finally, by punishing him for speaking to his students on a matter of public concern, when such speech was not in violation of any LSC policy, Defendants violated his First Amendment rights.

9.     In sum, Policy #1446 was unconstitutional, arbitrary, and thereby unlawful. This Court should grant Professor Stewart's motion for declaratory and injunctive relief, recognizing that his constitutional rights have been violated and that he must be reinstated to his position as soon as possible to mitigate his injury.

## PARTIES

10.     Plaintiff Russell Stewart (60 years old) was a professor of philosophy at Lake Superior College (LSC), a member of the Minnesota State Colleges and Universities System, located in Duluth, Minnesota, from September of 1992 until his termination, on March 11, 2022.

11.     Defendant Timothy Walz is the Governor of the State of Minnesota. He is sued in his official capacity.

12.     Defendant Patricia Rogers is the President of LSC. She is sued in her official capacity.

13.     Linda S. Kingston is Vice President of Academic and Student Affairs at LSC. She is sued in her official capacity.

14.     Jestina Vichorek is Director of Human Resources at LSC. She is sued in her official capacity.

15.     Nickoel Anderson is Vice President of Administration at LSC, having succeeded Al Finlayson to this position. She is sued in her official capacity.

## STATUTORY AND NONSTATUTORY JURISDICTION AND VENUE

16.     This Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)–(4) (equitable relief), 42 U.S.C. §§ 1983 and 1988, as well as under non-statutory equitable jurisdiction. That is because the claims here arise under the Constitution, as Professor Stewart seeks injunctive redress against state actors in their official capacity to end the deprivation, under state law, of his rights, privileges, and immunities secured by federal law.

17.    Personal jurisdiction exists, and venue for this action properly lies in this District pursuant to 28 U.S.C. § 1391(b)(1), because "all defendants are residents of the State in which the district is located."

18.    This Court's equitable powers permit it to issue non-statutory injunctions to protect Professor Stewart against wayward state actors engaged in unlawful conduct. *See Trump v. Vance*, 591 U.S. 786, 806 (2020) ("[F]ederal courts may enjoin state officials to conform their conduct to federal law") (citing *Ex parte Young*, 209 U.S. 123, 155–156 (1908)).[1] The only limitation is that a defendant subject to such an injunction must possess a connection to the establishment and enforcement of LSC's vaccine mandate. Each of the defendants in this action has the requisite connection. *See, e.g., Treleven v. University of Minnesota*, 73 F.3d 816, 819 (8th Cir. 1996) (holding that professor seeking reinstatement to state university was not barred from bringing his claims in federal court); *Nelson v. University of Texas at Dallas*, 535 F.3d 318, 322 (5th Cir. 2008) (collecting cases from the Second, Third, Fourth, Sixth, Seventh, Eighth, Ninth, and Tenth Circuits to conclude that "the great weight of case authority clearly supports treating reinstatement as an acceptable form of prospective relief that may be sought through *Ex parte Young*."). *See generally Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 n.2 (2010) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution").

19.    This Court may also issue declaratory relief pursuant to 28 U.S.C. § 2201. Additionally, "[f]urther necessary or proper relief based on a declaratory judgment may [also]

---

[1] *See* Erwin Chemerinsky, FEDERAL JURISDICTION 419 (8th ed. 2021) (*Ex parte Young* "has been heralded as 'one of the three most important decisions the Supreme Court of the United States has ever handed down.'"), *quoting Allied Artists Pictures Corp. v. Rhodes*, 473 F. Supp. 560, 564 (E.D. Ohio 1979) (citations omitted).

be granted …," including via injunction. 28 U.S.C. § 2202. *See also Powell v. McCormack*, 395 U.S. 486, 499 (1969) ("A declaratory judgment can then be used as a predicate to further relief, including an injunction.") (citing 28 U.S.C. § 2202).

## STATEMENT OF FACTS

### I. THE CORONAVIRUS PANDEMIC, COVID-19 VACCINES, AND NATURALLY ACQUIRED IMMUNITY

20.    Covid-19 is a contagious virus that is spread primarily through person-to-person contact.

21.    The first cases of Covid-19 were confirmed in the United States in January of 2020.

22.    While little was known about the novel virus at the time, scientists rapidly gained a better understanding of its transmissibility, lethality, and treatment responses.

23.    Relatively early in the pandemic, it became clear that the coronavirus presented a significant risk primarily to individuals aged 70 or older and those with comorbidities such as obesity and diabetes.[2]

24.    In late 2020, the Food and Drug Administration (FDA) approved three vaccines pursuant to the federal Emergency Use Authorization (EUA) authority. *See* 21 U.S.C. § 360bbb-3.

a.    FDA issued an EUA for the Pfizer Vaccine on December 11, 2020, and it was fully approved on August 23, 2021.

---

[2] *See* Smiriti Mallapaty, *The Coronavirus Is Most Deadly If You Are Older and Male*, Nature (Aug. 28, 2020) (individuals under 50 face a negligible threat of a severe medical outcome from a coronavirus infection, akin to the types of risk that most people take in everyday life, such as driving a car).

b.      FDA issued an EUA for the Moderna Vaccine on December 18, 2020, and granted it full approval on January 31, 2022.

c.      FDA issued an EUA for the Janssen Vaccine on February 27, 2021, and never fully approved it. Its emergency approval expired in May of 2023, and it is no longer authorized for use in the United States.

25.      The vaccines' EUA status meant that FDA had not yet approved the vaccines but rather permitted their use due to exigent circumstances. *See* 21 U.S.C. § 360bbb-3.

26.      The standard for attaining EUA approval is lower than that required for the full FDA approval.

27.      Typically, vaccine development takes 10-15 years of research and occurs over three or four phases: (1) testing on small groups of people; (2) testing on hundreds of people; (3) testing on thousands of people; and (4) clinical trials in the general population (which may begin only after such trials are approved by the FDA). Such trials involve a formal, ongoing study to evaluate the new vaccine's safety and effectiveness over a long period of time.[3]

28.      Finally, to achieve full approval, the manufacturer must demonstrate that it can produce the vaccine under conditions that assure adequate quality control.[4]

29.      In contrast to this rigorous approval process that includes long-term data review, FDA grants EUAs in emergencies "based on a reasonable belief that the product may

---

[3] *See How Vaccines are Developed and Approved for Use*, CDC (Aug. 10, 2024), *available at* https://tinyurl.com/ywd8xjba (last visited Apr. 1, 2025).

[4] *See id.*

be effective based on the best evidence available at the time, without waiting for all the information that would be needed for an FDA approval."[5]

30.    Under the EUA statute, individuals to whom the product is administered must be informed: (1) that the Secretary has authorized emergency use of the product; (2) of the significant known and potential benefits and risks of such use, and the extent to which such benefits and risks are unknown; and (3) of the option to accept or refuse administration of the product, of the health consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and their benefits and risks. 21 U.S.C. § 360bbb-3(e)(1)(A)(ii).

31.    Studies of Covid-19 immunizations in general populations, outside of clinical-trial settings, began in December 2020.

32.    Viruses confer immunity following infection, known as natural immunity or naturally acquired immunity.

33.    Any claim that vaccine-induced immunity is superior to that induced through infection rejects the core tenets of centuries of immunology. Vaccines and infections do not work through separate, disconnected immune systems, which is the principle underlying every vaccine.

34.    In the context of Covid-19, multiple extensive, peer-reviewed studies comparing naturally acquired and vaccine-acquired immunity have concluded overwhelmingly

---

[5] *Understanding the Regulatory Terminology of Potential Preventative and Therapeutic Drugs for COVID-19*, FDA (Apr. 13, 2023), *available at* http://bit.ly/3DZbcKq (last visited Apr. 1, 2025).

that the former provides equivalent or greater protection against severe infection and transmission than immunity generated by mRNA vaccines.

35.    Indeed, the protection that the Covid-19 vaccines provide against infection is short-lived and degrades significantly faster when compared to protection provided by natural immunity.

36.    Pfizer's own trials found that prior infection (as opposed to vaccination) was highly effective against transmission and infection. In its December 2020 FDA filing Pfizer wrote that "VE [vaccine efficacy] point estimates were uniformly high across the subgroups examined with the exception of … participants with evidence of prior SARS-CoV-2 infection at enrollment, for which too few COVID-19 cases occurred to interpret efficacy data."[6]

37.    When the vaccines first became available for public use in early 2021, health officials and the media widely broadcast that the vaccines were safe and effective. Concerns about possible unknown long-term effects were dismissed, and those who did not want to get the vaccine were generally labeled antisocial and unworthy of consideration.

38.    While initially public health officials confidently proclaimed that the Covid-19 vaccines arrested the spread of the virus, they began walking back these assertions as early as August of 2021, when the   Centers for Disease Control and Prevention (CDC) Director publicly admitted that the vaccines do not prevent infection or transmission.[7]

---

[6] *FDA Briefing Document*, Vaccines and Related Biological Products Advisory Committee Meeting (Dec. 10, 2020), *available at* https://www.fda.gov/media/144245/download, p. 25 (last visited Apr. 3, 2025).

[7] Madeline Holcombe and Christina Maxouris, *Fully Vaccinated People Who Get a Covid-19 Breakthrough Infection Transmit the Virus, CDC Chief Says*, CNN Health (Aug. 6, 2021) https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html (last visited Feb. 13, 2025).

39.    In fact, by July of 2021, the CDC had acknowledged on its website that the vaccinated are as likely as the unvaccinated to spread the virus.[8]

40.    Indeed, the vaccine trials never tested for prevention of transmission, as Pfizer itself acknowledged.[9]

41.    Because Covid-19 vaccines do not prevent transmission of the virus, the beneficiary of a Covid-19 vaccine is the recipient himself.

42.    As time went on, side effects of the Covid-19 vaccines that had formerly been unknown manifested, including myopericarditis (an inflammation of the heart tissue and/or pericardial lining of the heart), which can have serious, deleterious long-term consequences. Other risks include white blood cell count reduction, drops in platelet count, a trend towards increased reinfection rates, and appendicitis.[10]

43.    Though the CDC initially denied any evidence of post-vaccine myocarditis, it had to backtrack this premature proclamation.[11]

---

[8] Catherine M. Brown, et al., *Outbreak of SARS-CoV-2 Infections, Including COVID 19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings—Barstable County, Massachusetts, July 2021*, Morbidity & Mortality Wkly. Rep. (Aug. 6, 2021) *available at* https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w (last visited Apr. 1, 2025).

[9]    *Pfizer-BioNTech    Covid-19    Vaccine    EUA    Amendment    Review    Memorandum*,    *available    at* https://www.fda.gov/media/148542/download#page=38; https://www.fda.gov/media/144859/download at 342:1-7 (last visited Apr. 3, 2025).

[10] *See, e.g.,* Laura Semenzato, et al., *Long-Term Prognosis of Patients With Myocarditis Attributed to COVID-19 mRNA Vaccination, SARS-CoV-2 Infection, or Conventional Etiologies*, JAMA Network (Aug. 26, 2024), https://shorturl.at/jxxXX (last visited Apr. 1, 2025); Hui-Lee Wong, et al., *Surveillance of COVID-19 vaccine safety among elderly persons aged 65 years and older*, 41 Vaccine 532 (2023), *available at* https://www.sciencedirect.com/science/article/pii/S0264410X22014931 (last visited Apr. 1, 2025); Guy Witberg, et al., *Myocarditis after Covid-19 Vaccination in a Large Health Care Organization*, New Engl. J. Med. (Oct. 6, 2021), *available at* https://www.nejm.org/doi/full/10.1056/NEJMoa2110737 (last visited Apr. 1, 2025); Naoki Hoshino, *et al., An autopsy case report of fulminant myocarditis: Following mRNA COVID-19 vaccination*, PubMed (Jul. 4, 2022), *available at* https://pubmed.ncbi.nlm.nih.gov/35812802/ (last visited Apr. 1, 2025).

[11] Letter from Mary A. Malarkey and Marion F Gruber, FDA, to Amit Patel, BioNTech Manufacturing GmbH (Aug. 23, 2021), *available at* https://www.fda.gov/media/151710/download (last visited Apr. 3, 2025).

44.    Those who have recently recovered from a Covid-19 infection are at greater risk of adverse side effects from the vaccines than those with a naïve immune system.

45.    The heightened risk of adverse effects results because "preexisting immunity to SARS-Cov-2 may trigger unexpectedly intense, albeit very rare, inflammatory and thrombotic reactions in previously immunized and predisposed individuals."[12]

46.    Vaccination of the naturally immune may *increase* their chances of reinfection. Some experts believe that subsequent vaccination for those who have been previously infected may cause "'exhaustion,' and in some cases even a deletion, of T cells," leading to a depleted immune response.[13]

47.    The above confirms the fact that blanket vaccine mandates for Covid-19 inoculations were always ill-conceived and out of line with the available evidence.

## II.    PROFESSOR STEWART'S BACKGROUND

48.  Professor Stewart began working at LSC in September of 1992. In 1995, he became a UFT faculty member, which is equivalent to a tenured position. He taught ethics, logic, introduction to philosophy, political philosophy, philosophy of religion, critical thinking, and environmental ethics courses.

49. For the duration of his employment, he was a member of his union—the Minnesota State College Faculty Association.

---

[12] Fabio Angeli, *et al.*, *SARS-CoV-2 Vaccines: Lights and Shadows*, 88 Eur. J. Internal Med. 1, 7 (2021). *See also* Jennifer Block, *Vaccinating people who have had covid-19: why doesn't natural immunity count in the US?* British Med. J. (Sept. 13, 2021), *available at* https://www.bmj.com/content/374/bmj.n2101 (last visited Apr. 1, 2025) (citing several experts and studies establishing that those who have previously been infected are more likely to experience adverse side effects from the vaccines).

[13] *Id.*

50. Prior to September of 2021, Professor Stewart had never been subjected to discipline at work. He was held in high regard by his peers and his students alike.

51. From the onset of the Covid-19 pandemic, Professor Stewart paid close attention to news about the issue and became increasingly troubled by the changing narrative around it from government agencies, as well as what he considered misguided, authoritarian, and unlawful policy responses.

52. In the spring of 2020, Professor Stewart's courses moved online.

53. Professor Stewart looked forward to returning to the classroom in the fall of 2021. It appeared that the pandemic was waning and life would return to normal.

54. The Covid-19 peacetime state of emergency ended on July 1, 2021, pursuant to an act of the state legislature signed into law by Governor Walz.

55. However, as the summer came to an end and the Delta variant proliferated, things took a turn for the worse.

III.    GOVERNOR WALZ'S VACCINE MANDATE FOR STATE EMPLOYEES

56.    In August of 2021, Governor Walz announced that state employees returning to the workplace would be required to show proof of either Covid-19 vaccination or undergo testing at least once a week, effective September 8, 2021 (Policy #1446).[14]

57.    The purpose of requiring vaccination, in Governor Walz's words, was to "keep our workers safe ... It's how we take care *of each other* as Minnesotans." (emphasis added).

---

[14] *See* Office of Governor Tim Walz and Lt. Governor Peggy Flanagan, *Governor Walz Announces Vaccination Requirements for State Agency Employees* (Aug. 11, 2021), *available at* https://mn.gov/governor/covid-19/news/?id=1055-493652 (last visited Apr. 3, 2025).

58.    Lieutenant Governor Peggy Flanagan and Minnesota Health Department Commissioner Jan Malcolm made similar statements, all to the effect of vaccination being the best means of keeping each other safe.

59.    The policy was formalized by the Minnesota Office of Management and Budget (OMB) and applied to employees of all Minnesota State colleges and universities. *See* Exhibit A (Policy Memo).

60.    In the document memorializing Policy #1446, the OMB claimed that, according to the CDC and Minnesota Department of Health (MDH), the best way to prevent infection and the spread of Covid-19 was through vaccination. *See* Policy Memo, 1. The memo further claimed that the vaccines had been proven "safe and effective," that unvaccinated staff posed a greater risk to themselves, their colleagues, and the public than vaccinated employees, and that unvaccinated individuals transmit the Delta variant of Covid-19 more frequently than vaccinated individuals. *See* Policy Memo, 1.

61.    In order to meet the State's requirements, employees had to provide proof that they had received the full course of a Covid-19 vaccine approved by the FDA or the World Health Organization (WHO). *See* Policy Memo, 2-3.[15]

62.    The only alternative was to undergo frequent Covid-19 testing—at least once a week, or more if required by the employer. *See* Policy Memo, 4.

63.    Noncompliant employees were subject to disciplinary action, up to and including discharge. *See* Policy Memo, 4.

---

[15] The WHO approved many vaccines that provided protection inferior even to that conferred through vaccination with vaccines approved by FDA on an emergency basis.

64.     Prior to any final termination, an employee had to have been offered a meeting with his or her supervisor and a union representative to discuss the reasons for discipline. An employee could also be put on unpaid leave. *See* Policy Memo, 4.

65.     The memo provided that testing information may be shared with the designated laboratory, designated vendor, Minnesota Department of Health, local public health, agency HR staff, agency safety administrator, members of the agency's staff with a business "need to know," and others authorized by law. *See* Policy Memo, 5.

66.     Covid-19 vaccination status could be shared with agency HR staff, agency safety administrators, members of the agency's staff with a business "need to know," and others authorized by law. *See* Policy Memo, 5.

67.     Governor Walz admitted that, due to a Minnesota state law, he could *not* impose a vaccine mandate on Minnesota citizens. He maintained nevertheless that he *could* condition continued state employment upon receipt of a Covid-19 vaccine.[16]

68.     The state law in question, titled "Refusal of Treatment," provides that even during a peacetime state of emergency, "individuals have a fundamental right to refuse medical treatment, *testing*, physical or mental examination, *vaccination*, participation in experimental procedures and protocols, *collection of specimens*, and preventive treatment programs." Minn. Stat. § 12.39 (emphasis added).

69.     However, Minnesota was not even in a peacetime state of emergency, as the legislature had ended the declared state of emergency in July of 2021.

---

[16] *See* Peter Callaghan, *Why Gov. Tim Walz couldn't impose a vaccine mandate for Minnesota—even if he still had emergency powers*, MinnPost (Oct. 6, 2021), *available at* https://www.minnpost.com/state-government/2021/10/why-gov-tim-walz-couldnt-impose-a-vaccine-mandate-for-minnesota-even-if-he-still-had-emergency-powers/ (last viewed Apr. 1, 2025).

70.     Notably, the State of Minnesota recognizes the presence of non-vaccine induced immunity (including naturally acquired immunity) as a basis for exemption from school immunization requirements. *See* Minn. Stat. § 121A.15(3)(c).

## IV.   PROFESSOR STEWART'S OBJECTION TO THE VACCINE/TESTING REQUIREMENT

71.     LSC is a member of the Minnesota State Colleges and Universities System, and as such is publicly funded.

72.     Professor Stewart, along with all other LSC employees, received an email in mid- to late-August of 2021 informing him that he was required to receive a Covid-19 vaccination by September 8, 2021, or else to undergo testing at least weekly. He was to indicate his vaccination status via an Attestation Form or submit to the testing alternative.

73.     The form required accepting that "My data, including my information and my specimen, may be collected, shared, used and retained by my agency as detailed in HR/LR Policy #1446 COVID-19 Proof of Vaccination and Testing, as detailed above, and as authorized by law."

74.     On or around September 10, Professor Stewart submitted an Attestation Form indicating that he refused to reveal his vaccination status, and submitted the Consent Form without filling it out, indicating that he did not consent to Policy #1446.

75.     On September 22, Linda Kingston, Vice President of Academic and Student Affairs, emailed Professor Stewart because he had not submitted the Attestation Form on time, nor had he completed the weekly testing requirement on September 20. Ms. Kingston set up a meeting for September 27 to discuss the policy and the implications of Professor Stewart's failure to comply with it.

76.    The following day, September 23, Professor Stewart replied to Ms. Kingston. He explained that he did not intend to comply with Policy #1446, because Governor Walz and the Minnesota OMB had neither the Constitutional nor statutory authority to impose it, as the Governor had no emergency powers at the time. He objected to the policy as not only unlawful but arbitrary, coercive, and violative of sacrosanct rights to medical autonomy, bodily self-determination, and privacy.

77.    At the September 27 meeting, at which Dr. Kingston, Director of Human Resources Jestina Vichorek, and union representative Damon Kapke were present, Professor Stewart reiterated similar objections to Policy #1446 to those made in his September 23 email.

78.    The college offered, as a form of accommodation, an alternative testing consent form. Ms. Vichorek claimed that she was authorized to retain the data acquired from testing and that she would maintain Professor Stewart's privacy.

79.    Upon information and belief, despite Ms. Vichorek's assurances, the testing company would also have access to the data, and Professor Stewart had no assurance that such data would not be retained.

80.    Professor Stewart declined, saying that he refused to submit to an illegal policy.

81.    The college administration offered an alternative testing method (saliva, rather than a nasal swab), but Professor Stewart maintained that he objected to any type of testing.

82.    Upon information and belief, the testing offered to Professor Stewart involved a collection of genetic material, which would be retained by the State, regardless of these accommodations.

83.     Ms. Vichorek informed Professor Stewart that he would immediately be placed on unpaid leave and remain on that status until he came into compliance with Policy #1446. Professor Stewart was prohibited from teaching his classes that were scheduled for the next day. Ms. Vichorek told him, "Go home and we will take care of your classes and your courses and your students."

84.     When Professor Stewart informed Ms. Vichorek that this action did not comport with contractual requirements regarding disciplinary action, Ms. Vichorek informed him that this was not a disciplinary measure or termination of his employment. Professor Stewart was then barred from being on campus and prohibited from teaching his classes, even those that were fully online. He was again told, "We will take care of your students and all your courses."

85.     When Professor Stewart asked if he would still have access to his work email, Ms. Vichorek told him that question remained undecided.

86.     At no time during the meeting or at any other point that day was Professor Stewart instructed not to contact his students or not to use his work email address.

87.     Later that day, Professor Stewart sent his students an email explaining that he had been placed on unpaid leave and excluded from the LSC campus because he refused to comply with Policy #1446. He clarified that he was not opposed to vaccines in general or the Covid-19 inoculations in particular, but considered the policy unlawful, immoral, and arbitrary because it deployed workplace coercion to undermine the sacrosanct rights of bodily autonomy and privacy. *See* 9/27/21 Email of Russell Stewart, Exhibit B.

88.     Professor Stewart further expounded upon his reasoning: that he considered the policy to be unlawful and unconstitutional, and that the "arbitrary whims of politicians and bureaucrats cannot form the basis for civil society, yet that is the direction the state of Minnesota has taken under the Governorship of Tim Walz." *See* Exhibit B.

89.     He concluded:

> This is my 30th year teaching at this institution. It has been a pleasure to serve thousands of students over those many years. I love my work and wish that I could continue to teach my classes but the administration has forbidden that. I am deeply sorry that it has come to this, but I refuse to be coerced into doing something that violates fundamental rights. I know you will have many questions. I will not be in a position to answer them. In many ways I am as shocked and puzzled as you are. I don't know when or if I will be allowed to resume my teaching duties. In the meantime I wish you all the best. I encourage you to pay attention to the world around you and think hard about what you see and hear.

*See* Exhibit B.

90.     The following day, Ms. Vichorek sent Professor Stewart an email attaching the revised consent form that had been discussed, and the written advisory issued to him at the meeting. His access to email was removed until he came into compliance with Policy #1446.

91.     On October 4, 2021, Ms. Vichorek sent Professor Stewart a letter informing him that he was again the subject of a misconduct investigation. Ms. Vichorek alleged that Professor Stewart had committed misconduct because he (a) refused to comply with Policy #1446 and (b) "failed to conduct [him]self in a manner that demonstrates professionalism and respect for others in the work place" by "engag[ing]" in communication with students that a reasonable person would not find appropriate," as well as (c) "inappropriate and unauthorized use of state property when [he] used [his] Lake Superior College email address to contact the

students enrolled in [his] courses to express [his] personal political opinions while representing Lake Superior College."

92.    Ms. Vichorek ordered Professor Stewart to cooperate with the investigation by making himself available for interviews; responding to questions truthfully; providing any requested materials; retaining books, papers, documents, or other relevant evidence; and not discussing the investigation with any LSC or State of Minnesota employees, students, or other potentially involved individuals.

93.    While Professor Stewart was not required to provide information during the forthcoming interview, scheduled for October 7, failure to provide such information "may lead us to consider any allegations…unchallenged or unrefuted."

94.    At the October 7 disciplinary hearing, which took place over Zoom, Professor Stewart stated that he was aware of LSC's policies relating to use of college email, but did not believe his September 27 email to his students violated the policies. He sent the email because it seemed the most expedient way of communicating with his students.

95.    On November 10, 2021, Vice President of Administration Alan Finlayson sent Professor Stewart a certified letter regarding the results of the investigation. Mr. Finlayson issued a two-day suspension without pay, which Professor Stewart found strange since he had been on unpaid involuntary leave since September 27.

96.    The reasons for the action that Mr. Finlayson cited were Professor Stewart's refusal to comply with Policy #1446 and alleged disregard for an instruction (which was never actually given) from Linda Kingston, Vice President of Academic and Student Affairs, not to contact his students regarding his teaching status.

97.     According to Mr. Finlayson, this email contact "implicate[d]" Minnesota State Board Policy 5.22 and Procedure 5.22.1, the latter of which states that "employees are expected to use the traditional communication rules of reasonableness, respect, courtesy, and common sense when using system information technology," as well as LSC Policy 5.2 which states that "official email communications are intended only to meet the academic and administrative needs of the College community."

98.     According to Mr. Finlayson, Professor Stewart's email communication had "no relationship to the College's academic mission[.]"

99.     Mr. Finlayson alleged that Professor Stewart's decision "to ignore the directive of Vice President Kingston and contact the students is not justified …. By disregarding Vice President Kingston's directive and contacting students directly, [his] actions caused a significant disruption of the students' learning environment and interfered with the College's educational mission."

100.    Mr. Finlayson gave Professor Stewart five (5) days to comply with Policy #1446 by completing an Attestation Form or consenting to testing. Mr. Finlayson warned him that continued refusal to follow work directives and further policy violations would lead to increased discipline, up to and including discharge.

101.    Mr. Finlayson reminded Professor Stewart that he was permitted to respond to these charges in writing or during a prescheduled November 15 meeting, at which he was entitled to the presence of a union representative.

102.    Absent a modification or retraction of Mr. Finlayson's decision, Mr. Stewart would be suspended from duty without pay effective November 18 and 19, 2021. If he came into compliance, he was to report to work on November 22, 2021.

103.    On November 14, 2021, Professor Stewart responded in writing to Mr. Finlayson's determination. He contested the charge pertaining to the email to his students, explaining that Ms. Kingston had never told him not to contact them regarding his teaching status. Professor Stewart pointed out that Ms. Vichorek's October 4 letter did not mention a directive with respect to email usage, which indicated that the allegation had been added *post hoc*.

104.    Professor Stewart contested the characterization of the email as unrelated to LSC's mission and values. As he explained, LSC claimed to value "trust and respect, academic freedom and free inquiry, integrity and stewardship, collaboration [and] community." His email was "supportive of the mission and these values" especially since the Minnesota transfer curriculum purports to infuse critical thinking through its curriculum. "My email served as an invitation to my students to engage in critical thinking," he wrote, "Everything stated in that email was reasonable under the principle of academic freedom as embraced by LSC." Additionally, his students had a right to understand his reasons for refusing to comply with Policy #1446, and his email did not violate any policies but to the contrary, "upheld the core principles upon which academic excellence is founded."

105.    Professor Stewart reiterated his principled objection to Policy #1446 and asked to return to teaching.

106.    On November 15, Mr. Finlayson responded via certified letter, upholding the initial misconduct finding and instructing Professor Stewart on how he could appeal through his union.

107.    The following day, November 16, Professor Stewart requested that his union, the Minnesota State College Faculty Association, file a grievance on his behalf. Damon Kapke, the union representative, responded that there was nothing he could do as Professor Stewart was in violation of Policy #1446 and that since Ms. Kingston had put him on unpaid status, he could not argue that he had a "protected right to teach" his students.

108.    On November 23, 2021, Ms. Vichorek sent another letter informing Professor Stewart that he was again the subject of a misconduct investigation. The letter was nearly identical in relevant part to the October 4 one, except that the investigation was restricted to misconduct related to noncompliance with Policy #1446 and omitted the email issue.

109.    The following day, Ms. Vichorek informed Professor Stewart that a second investigative meeting would be held on the thirtieth of the month to address his noncompliance with Policy #1446, but the meeting was rescheduled for December 8.

110.    In a letter to the LSC Administration dated December 8, Professor Stewart again reiterated his moral, medical, and legal objections to Policy #1446 and affirmed that he would not comply.

111.    The short meeting was held on December 8, at which Professor Stewart maintained he would not comply with the policy.

112.    Mr. Finlayson wrote another letter to Professor Stewart dated December 13, 2021, issuing a five-day suspension and explaining that unless Professor Stewart came into

compliance with Policy #1446, he was to be suspended without pay January 6, 7, 10, 11 and 12, 2022. Unless he capitulated to the policy, he was not to report for work on January 13 and would remain on unpaid leave.

113.    Again, Professor Stewart found the penalty "bizarre" given that he was already on involuntary unpaid leave.

114.    Once again, Professor Stewart sent a letter repeating his objections to Policy #1446 and Mr. Finlayson upheld the five-day suspension.

115.    On or around December 7, 2021, Professor Stewart contracted Covid-19. After experiencing mild symptoms, he went to a clinic on December 10 and received a PCR test because he thought that the college and/or the state might make an exception to the policy for people with natural immunity. The test was indeed positive.

116.    On January 14, 2022, Professor Stewart received notice of a third investigative meeting scheduled for January 25, 2022, to address his noncompliance with Policy #1446.

117.    Professor Stewart asked if there had been any alterations to Policy #1446 and specifically inquired whether there were exemptions for those with naturally acquired immunity, and religious exemptions, with the obvious implication that he had such immunity.

118.    Ms. Vichorek responded that Policy #1446 had not been revised and that he could request a religious exemption from the President of the College.

119.    On January 25, 2022, Professor Stewart wrote to President Patricia Rogers and requested an exemption based on the theory that the vaccination policy and testing alternative "would force me to violate my sincerely held religious commitment to the principles of liberty, equality, and consent," and argued that its failure to account for naturally acquired immunity,

which many researchers deem superior to that induced through vaccination, rendering Policy # 1446 "coercive by design."

120.    He elaborated that:

 a. The policy violated his inalienable right to personal liberty with respect to his medical choices;

 b. The policy was imposed despite not complying with the state law requirements for implementing vaccine mandates; and

 c. The policy violated the principle of equality by deploying workplace coercion in an arbitrary and discriminatory manner through its requirement of an invasive weekly medical test.

121.    Professor Stewart further explained that he did not consider the test alternative a minor inconvenience. Rather, the requirement had a "sinister character" as it constituted an attempt to coerce people into revealing private medical information and taking an experimental mRNA vaccine.

122.    Since the state of emergency that Governor Walz declared ended in July of 2021, prior to issuance of Policy #1446, the mandate also did not qualify as a legitimate emergency measure.

123.    Moreover, the policy did not make sense, since by the time it was implemented, it was already known that fully vaccinated people could spread the virus, evidence that had grown only more robust as time went on.

124.    Professor Stewart pointed out that if Minnesota truly believed weekly testing was necessary to prevent the spread of Covid-19, vaccinated employees would have been required to test as well.

125.    Moreover, he argued, the CDC was *not* recommending routine testing of asymptomatic individuals, and the policy failed to address the substantial body of evidence suggesting that natural immunity provides significant protection from re-infection, perhaps greater than (but at least equivalent to) the vaccination-provided protection.

126.    Professor Stewart concluded:

> Therefore, I am forced to conclude that HR/LR policy 1446 is coercive by design. It treats people unequally for no good reason. It violates the fundamental rights of state employees who refuse to report their vaccination status. It was not established by due process of law, but rather it was imposed on me without my consent …. I am willing to take a COVID-19 test if I become symptomatic, and I am willing to follow quarantine guidelines if I am found to be positive. But I am not willing to be violated by pointless genetic testing on a weekly basis to satisfy the demands of a remote bureaucracy with no respect for my dignity as an autonomous citizen of a free country.

127.    That same day, Professor Stewart attended an investigative meeting that was held over Zoom.

128.    Ms. Vichorek denied Professor Stewart's request for a religious exemption on January 26, 2022.

129.    On February 2, Mr. Finlayson issued Professor Stewart a 10-day suspension for "misconduct" for his ongoing failure to comply with Policy #1446. At the meeting held on February 4, Professor Stewart was instructed that he would be suspended without pay

February 7 through 11 and 14 through 18 and was to return on February 22nd *if* he came into compliance with Policy #1446 by then.

130.     Professor Stewart responded on February 4, asking that his religious exemption request be reconsidered.

131.     Mr. Finlayson upheld the 10-day suspension on February 7.

132.     Ms. Vichorek sent Professor Stewart yet another certified letter notifying him that he was the subject of a misconduct investigation for noncompliance with Policy #1446. The letter was by and large a repetition of the letters that had been sent previously.

133.     An investigatory meeting was held on February 25, 2022, at which Professor Stewart reiterated his reasons for not complying with Policy #1446.

134.     On March 1, 2022, Professor Stewart received a proposed discharge letter from President Patricia Rogers. President Rogers cited as the reasons for his termination his ongoing refusal to get a Covid-19 vaccine or comply with the testing alternative, as well as sending an email to his students on September 27, 2021, despite ostensibly having been told not to contact his students regarding his teaching status. President Rogers informed Professor Stewart that, absent a modification of the decision, his discharge was effective March 11, 2022. He was to remain on involuntary unpaid leave until that day.

135.     Professor Stewart sent a response on March 7, 2022, expressing his dismay and disappointment with the outcome. He pointed out that the pandemic was winding down, and that he had taught at LSC for 30 years without any disciplinary issues. He maintained, however, that he would not comply with Policy #1446 and reiterated his objections to it. He once again stated his belief that he was entitled to a moral and religious exemption.

136.    President Rogers upheld the dismissal on March 10, 2022.

137.    After Professor Stewart was terminated, an adjunct professor assumed many of his duties, and LSC hired another adjunct to cover the remainder of the workload. These adjuncts had covered his courses during the several months Professor Stewart had been on unpaid leave.

138.    That LSC did not search for a new UFT professor to replace him meant that his position had been eliminated and no longer existed at LSC.

139.    On May 24, 2022, Minnesota quietly rescinded its vaccine/testing mandate for state employees.

**V.    PROFESSOR STEWART HAS EXPERIENCED, AND CONTINUES TO EXPERIENCE, CONCRETE AND PARTICULARIZED HARM AS A DIRECT CONSEQUENCE OF GOVERNOR WALZ'S STATE EMPLOYEE VACCINE MANDATE, EFFECTUATED BY HIS EMPLOYER, AND HIS EMPLOYER'S RETALIATORY VIOLATION OF HIS FIRST AMENDMENT RIGHTS.**

140.    Professor Stewart's only alternative to remaining unvaccinated was to comply with punitive, frequent testing requirements. Under either of these scenarios, Professor Stewart's personal  autonomy was infringed upon by measures that Governor Walz openly acknowledged were designed to coerce compliance and workaround state law prohibiting mandatory testing and vaccination.

141.    Either Professor Stewart had to get an experimental vaccine that Defendants knew or should have known did not prevent transmission of the Covid-19 virus, and thus offered no protection to anyone other than Professor Stewart himself, or he had to undergo frequent testing—the specific amount to be determined by LSC, but no less than once a week—which is burdensome, time-consuming, humiliating, and a privacy invasion.

142.    Moreover, the testing protocol made no sense, since samples sent to the laboratory often took days to process, so results would not be available until after the period of contagiousness had passed.

143.    The testing protocol was likewise arbitrary and punitive since it was not applied to the vaccinated even though they could also become infected and transmit the virus.

144.    Professor Stewart would have objected to weekly urine tests to maintain his employment, and by the same token, objected to at-least weekly Covid-19 tests.

145.    Policy #1446 further harmed Professor Stewart by making disclosure of personal health information a prerequisite for continuing to teach—including forced unpaid leave and termination of employment.

146.    By threatening adverse professional and personal consequences, Policy #1446 not only directly and palpably harmed Professor Stewart's bodily autonomy and dignity, but it forced him to endure the stress and anxiety of choosing between his teaching career and his health and privacy interests.

147.    The alleged risk-avoidance benefits that Policy #1446 offered were disproportionate to the restrictions and intrusive options imposed on Professor Stewart.

148.    Similarly, given that naturally acquired immunity confers equal or greater protection than that provided by the vaccines, Policy #1446 was arbitrary and irrational. Policy # 1446 was not tailored to account for naturally acquired immunity. To the contrary, Professor Stewart was explicitly told that acquiring natural immunity—as he did in December of 2021, of which he informed the university—did not put him in the same position as his vaccinated peers, a policy that makes no sense in view of the scientific evidence establishing that natural

immunity was more effective in terms of preventing infection and transmission than any of the available vaccines.

149.     Furthermore, Professor Stewart's September 27, 2021, email to his students—which constituted constitutionally protected speech—was cited among the bases for termination of his employment.

150.     Professor Stewart's termination from LSC after 30 years of employment caused and continues to cause him significant financial loss and emotional distress.

151.     Accordingly, Professor Stewart suffered and continues to suffer harm as a result of LSC's unconstitutional and retaliatory action taken in response to his sending an email to his students explaining his forthcoming absence from class.

152.     Professor Stewart demands a trial by jury on any issues so triable.

## CLAIMS FOR RELIEF

### COUNT I: VIOLATION OF FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS RIGHT TO REFUSE MEDICAL TREATMENT 42 U.S.C. § 1983 (ALL DEFENDANTS)

153.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

154.     The Due Process Clause of the Fourteenth Amendment provides: "nor shall any state deprive any person of life, liberty, or property, without due process of law … " U.S. Const., amend. XIV, § 1.

155.     Policy #1446 violates the liberty and autonomy interests protected by the Fourteenth Amendment to the United States Constitution.

156.    Our courts recognize that the Fourteenth Amendment safeguards the "well-established, traditional rights to bodily integrity and freedom from unwanted touching." *Vacco v. Quill*, 521 U.S. 793, 807 (1997). *See also Washington v. Harper*, 494 U.S. 210, 229 (1990) (recognizing that a "forcible injection … into a nonconsenting person's body represents a substantial interference with that person's liberty[.]").

157.    The Supreme Court has explained that the right of a "competent individual to refuse medical treatment" is "entirely consistent with this Nation's history and constitutional traditions" in light of the "common-law rule that forced medication was a battery, and the long legal tradition protecting the decision to refuse unwanted medical treatment." *Washington v. Glucksberg*, 521 U.S. 702, 724–25 (1997) (internal citation omitted for first quotation). *See also Cruzan v. Dir., Mo. Dep't of Public Health*, 497 U.S. 261, 278 (1990) ("At common law, even the touching of one person by another without consent and without legal justification was a battery") (internal citation omitted); *Schloendorff v. Soc'y of N.Y. Hosp.*, 105 N.E. 92, 93 (N.Y. 1914) (Cardozo, J.) ("Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages."), *abrogated on other grounds by Bing v. Thunig*, 143 N.E.2d 3 (N.Y. 1957); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, PROSSER AND KEETON ON LAW OF TORTS § 9, pp. 39–42 (5th ed. 1984).

158.    This right to bodily autonomy is "so rooted in our history, tradition, and practice as to require special protection under the Fourteenth Amendment." *Glucksberg*, 521 U.S. at 721 n.17.

31

159.    The Supreme Court's jurisprudence clarifies that compulsory treatment for the health benefit of the person treated, as opposed to the health benefit of third parties, implicates the fundamental right to refuse medical treatment implicit in the Due Process Clause of the Fourteenth Amendment. *See, e.g., Cruzan*, 497 U.S. at 278–79 (explaining that cases subsequent to *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) "support[] the recognition of a general liberty interest in refusing medical treatment" and that *Jacobson* itself "balanced an individual's liberty interest in declining an unwanted smallpox vaccine against the State's interest in preventing disease."). *See also Health Freedom Def. Fund, Inc. v. Carvalho*, 104 F.4th 715, 725 (9th Cir. 2024), *reh'g en banc granted, vacated by*, 127 F.4th 750 (9th Cir. 2025) ("The district court thus erred in holding that *Jacobson* extends beyond its public health rationale—government's power to mandate prophylactic measures aimed at preventing the recipient from spreading disease to others—to also govern 'forced medical treatment' for the recipient's benefit."); *King v. Rubenstein*, 825 F.3d 206, 222 (4th Cir. 2016) (recognizing right to refuse unwanted medical treatment).

160.    Likewise, in the Eighth Circuit, laws or executive orders passed and enforced while an emerging public health emergency is "rapidly developing, poorly understood, and in need of immediate and decisive action" can be subject to rational basis scrutiny under *Jacobson*, but after the immediate crisis has subsided, a return to traditional tiers of scrutiny is warranted. *See Heights Apartments, LLC v. Walz*, 30 F.4th 720, 726–27 (8th Cir. 2022) (citing *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18, 21 (2020)).

161.    Thus, Defendants must show that Policy #1446 was narrowly tailored to achieve a compelling state interest.

162.    The justification for Policy #1446, in Governor Walz's own words, was to prevent the spread of Covid-19.

163.    None of the Covid-19 vaccines available for use throughout Policy #1446's duration prevented recipients from spreading the virus.[17]

164.    At the time Defendants implemented Policy #1446 in August of 2021, they either knew or should have known that there was no evidence that the Covid-19 vaccines effectively stopped transmission since that information was available via the vaccine manufacturers' testing results well before issuance of Policy #1446.

165.    Moreover, the relevant scientific literature and basic principles of immunology established that once Professor Stewart acquired natural immunity to Covid-19, in December of 2021, he had protection against severe disease, infection, and transmission greater than that conferred by any of the available Covid-19 vaccines.

166.    Each Minnesota State employee was free to get vaccinated him or herself, and to enjoy the benefit provided by the vaccine, namely reduced chances of developing severe symptoms.

167.    Defendants did not have a compelling interest in requiring employees to get vaccinated or undergo at least weekly testing on pain of losing their job since there was never any evidence that the available vaccines stopped transmission and much evidence to the contrary.[18] This is particularly true for those with naturally acquired immunity like Professor

---

[17] See Joel Achenbach, Yasmeen Abutaleb, Ben Guarino, and Carolyn Y. Johnson, *Where's the data?*, WASHINGTON POST (July 28, 2021), *available at* wapo.st/2THpmIQ (last visited Mar. 13, 2025).

[18] See Yair Goldberg, et al., *Protection of Previous SARS-Cov-2 Infection Is Similar to That of BNT162b2 Vaccine Protection: A Three-Month Nationwide Experience From Israel*, MEDRXIV (Apr. 20, 2021), *available at* https://bit.ly/3zMV2fb (last visited Apr. 1, 2025); Marty Makary, *The Power of Natural Immunity*, WALL STREET JOURNAL (June 8, 2021), *available at* https://on.wsj.com/3yeu1Rx (last visited Apr. 1, 2025).

Stewart who were *less* likely than vaccinated employees without naturally acquired immunity to spread Covid-19.

168.    That the State recognizes naturally acquired immunity as a basis for exclusion from school immunization requirements further indicates that Policy #1446 was not narrowly tailored.

169.    Alternatively, even if an intermediate form of scrutiny governs this inquiry, the State must ensure that the "means [it] prescribed…has [a] real or substantial relation to the protection of the public health and the public safety." *See Jacobson,* 197 U.S. at 31–33, 37–39 (balancing liberty interests versus state interests in deciding whether state legislature's smallpox vaccine mandate was unconstitutional). *See also In re Cincinnati Radiation Litig.*, 874 F. Supp. 796, 813 (S.D. Ohio 1995) (explaining that, although *Jacobson* upheld compulsory vaccination to stop transmission, it had done so while "acknowledg[ing] that an aspect of fundamental liberty was at stake and that the government's burden was to provide more than minimal justification for its action.").

170.    For similar reasons to those discussed above, Policy #1446 did not appropriately balance the State's versus individuals' interests. There was no government interest in coercing Professor Stewart to get a vaccine that did not stop the spread of Covid-19 and for a virus to which he had acquired immunity naturally. At the same time, Professor Stewart had a liberty interest in declining a new, minimally tested vaccine and a property interest in retaining his UFT position. *See Jacobson*, 197 U.S. at 31–33.

171.    The testing alternative does not alter the analysis. Testing still required Professor Stewart to provide bodily fluids, genetic material, and private medical information to be

retained by his employer, the state, and others. *See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 119 (2022) (holding that OSHA did not have authority to mandate Covid-19 vaccination for employees as "a vaccination, after all, cannot be undone at the end of the workday" and testing alternative did not alter this conclusion) (internal citation and quotation marks omitted) (cleaned up). *See also In re MCP No. 165, OSHA, Interim Final Rule*, 20 F.4th 264, 273 (6th Cir. 2021) (Sutton, J., dissenting from denial of petition for rehearing *en banc*) ("A national vaccinate-or-test mandate likewise is unprecedented, whether with respect to OSHA or any other federal agency, presumably because the intrusion on individual liberty is serious[.]").

172.    And for the reasons discussed above, there was no reason to levy an additional burden and privacy intrusion on Professor Stewart not imposed upon his vaccinated peers, including those who had inferior immunity induced through vaccination.

173.    By failing to tailor Policy #1446 to account for the above circumstances, Minnesota forced Professor Stewart to choose between his health and his personal autonomy on one hand, and his career on the other.

174.    Professor Stewart has suffered continuing harm from Defendants' conduct. There is no adequate remedy at law, as there are no damages that could compensate Professor Stewart for the deprivation of his constitutional rights. He will continue to suffer irreparable harm unless this Court orders Defendants to reinstate him to the position he had before, which he lost only as a result of Defendants' violation of his constitutional rights.

175.    Professor Stewart is entitled to a judgment declaring that Policy #1446 violated his constitutional right to refuse medical treatment and an injunction requiring LSC Defendants to reinstate him to his position.

## COUNT II: VIOLATION OF THE UNCONSTITUTIONAL CONDITIONS DOCTRINE AND THE FOURTEENTH AMENDMENT'S RIGHT TO DUE PROCESS
## 42 U.S.C. § 1983 (ALL DEFENDANTS)

176.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

177.    Under the unconstitutional conditions doctrine, the government may not burden constitutional rights by penalizing the exercise of them. *See, e.g.*, *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013) ("[U]nconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them.").

178.    Conditioning continued public employment on the surrender of one's constitutional rights creates an unconstitutional condition. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests.").

179.    That is true even when the right in question is not enumerated in the Constitution. *See Mem'l Hospital v. Maricopa County*, 415 U.S. 250 (1974) (holding that county

impermissibly burdened right to travel interstate by giving healthcare only to indigent individuals who had been residents for at least a year).

180.    For the reasons discussed *supra*, Count I, Professor Stewart possessed a liberty interest in his bodily integrity and a right to refuse medical treatment and testing free of coercion and, as a tenured (UFT) professor, a property interest in his teaching career.

181.    Governor Walz effectively admitted that he was creating an unconstitutional (or unlawful) condition when he acknowledged that he could not enact an outright mandate under Minnesota state law but was attempting to circumvent that law by predicating continued State employment upon receipt of a Covid-19 vaccine (or frequent, punitive testing involving collection of bodily fluids and waiver of privacy interests).

182.    As applied here, the State of Minnesota burdened Professor Stewart's right to refuse unwanted medical treatment under the Fourteenth Amendment and State law by conditioning his continued employment (despite his UFT status) upon taking an unwanted vaccine or submitting to frequent testing.

183.    Accordingly, Policy #1446 created an unconstitutional condition.

184.    Professor Stewart suffered and continues to suffer from this violation of his rights, as he has remained unemployed since LSC made a final determination terminating his employment on March 10, 2022.

185.    Since Policy #1446 constituted an unconstitutional condition, Professor Stewart should never have been fired, and the Court should issue a declaratory judgment to that effect and order LSC Defendants to reinstate him.

<u>COUNT III: VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE
FOURTEENTH AMENDMENT
42 U.S.C. § 1983 (ALL DEFENDANTS)</u>

186.    Plaintiff realleges and incorporates by reference the foregoing allegations as though fully set forth herein.

187.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state may "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1.

188.    Under the Equal Protection Clause, state and local governments may not, without adequate justification, discriminate among citizens, denying to some rights or benefits that are available to other similarly situated citizens. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985).

189.    The Clause "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn,* 505 U.S. 1, 10 (1992). *See also Cleburne*, 473 U.S. at 440 (explaining that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike"); *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920) ("The Equal Protection Clause directs that all persons similarly circumstanced shall be treated alike.")).

190.    Ordinarily, a state regulation or policy will be presumed valid and sustained if the classification is rationally related to a legitimate state interest. *See Cleburne,* 473 U.S. at 440.

191.    A higher level of scrutiny applies when fundamental rights or a suspect class are involved. *See, e.g., Plyler*, 457 U.S. at 224-30.

192.    Defendants have violated and are violating Professor Stewart's right to equal protection by treating him differently from his vaccinated peers without any rational basis, let alone one that would withstand a higher level of scrutiny.

193.    There is no question that Professor Stewart was and remains subject to differential treatment because of his unvaccinated status, as he was and remains terminated from LSC due to his refusal to get the vaccine or submit to a stringent, intrusive testing routine.

194.    Defendants' refusal to afford employees with natural immunity the same exemption that is provided to vaccinated employees does not rationally advance any legitimate governmental interest.

195.    As discussed above, the natural immunity arising from infection with Covid-19 provides more robust protection against re-infection and transmission than that conferred through vaccination.

196.    Thus, when Professor Stewart was terminated on March 10, 2022—having recovered from Covid just a few months prior in December of 2021—he presented a *lower* risk of contracting and transmitting the virus than vaccinated employees, particularly those who were vaccinated in the more distant past.

197.    There was no legitimate public health justification, or any other rational basis, for requiring Professor Stewart to vaccinate or undergo routine testing and terminating him for noncompliance with Policy #1446, given that he presented no greater (and in fact a lower) risk to those around him than vaccinated employees.

198.    For no rational reason whatsoever, Policy #1446 treated Minnesota State employees with natural immunity as second-class citizens by depriving them of their jobs

unless they consented to intrusions into their bodily autonomy. *See Cleburne*, 473 U.S. at 450 (classification may not be based on "irrational prejudice"); *Louisiana v. Becerra*, 571 F. Supp. 3d 516 (W.D. La. Nov. 30, 2021) ("[t]he rejection of natural immunity as an alternative is puzzling"), *stay of injunction granted by* 595 U.S. 87 (2022), *injunction vacated and remanded by* 2022 WL 21160002 (5th Cir. June 13, 2022); *Missouri v. Biden*, 571 F. Supp.3d 1079, 1095 & n.20 (E.D. Mo. 2021) (finding that CMS's changing posture with respect to natural immunity constituted evidence of unlawful agency action, and noting that "CMS also rejected natural immunity," despite a "trove of scientific data on the strength and durability of natural immunity from COVID-19 alone and compared to vaccine-induced immunity"), *stay of injunction granted by*, 595 U.S. 87 (2022), *injunction vacated and remanded by*, 2022 WL 1093036 (8th Cir. Apr. 11, 2022).

199.    A law may be "fair on its face," but "if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is … within the prohibition of the constitution." *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886).

200.    Blindly adopting CDC and Minnesota Health Department guidance, which Minnesota claimed served as the basis for its mandate, cannot constitute a rational basis when such guidance is unsupported (and indeed contradicted) by the contemporaneous and publicly available scientific evidence.

201.    There is a reason that guidance is not law: It has not gone through the legislative or rulemaking process, subject to the input of numerous individuals with different perspectives. Endowing it with undeserved authority is poor policy, indeed.

202.    This arbitrary, irrational, and discriminatory treatment—compounded by Minnesota's tradition of recognizing naturally acquired immunity in school vaccination requirements—violated and continues to violate Professor Stewart's fundamental rights to equal protection of the laws under the Fourteenth Amendment of the Constitution.

203.    Equal protection problems are compounded because individuals with naturally acquired immunity are at a disadvantage when it comes to vaccination, since immunization poses a greater risk of harm to them than to those who are unvaccinated and have not acquired immunity naturally, and immunization may in fact deplete their immune response.

204.    If Defendants are going to discriminate between employees, they must be able to establish some rational basis for that discrimination, at the very least. *See Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71, 83 (1988) ("[A]rbitrary and irrational discrimination violates the Equal Protection Clause under even our most deferential standard of review"); *Roe v. Shanahan*, 359 F. Supp. 3d 382, 410 (E.D. Va. 2019) ("rational basis review is not 'toothless'") (quoting *Mathews v. Lucas*, 427 U.S. 495, 510 (1976)).

205.    In sum, for no valid public health reason whatsoever, Professor Stewart was forced to choose between his job and a heightened risk of adverse side effects and even possible depletion of naturally acquired immunity, or submit to frequent testing that required him to provide bodily fluids and medical information to the State.

## COUNT IV: UNLAWFUL RETALIATION FOR EXERCISE OF FIRST AMENDMENT FREE SPEECH RIGHTS
## 42 U.S.C. § 1983 (LSC DEFENDANTS)

206.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

207.    The First Amendment prohibits government from "abridging the freedom of speech." U.S. Const., amend I.

208.    As a member of the Minnesota State Colleges and Universities System, LSC is subject to First Amendment constraints.

209.    "Criticism of public officials lies at the very core of speech protected by the First Amendment." *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002).

210.    Retaliation by a government actor in response to such an exercise of First Amendment rights forms the basis for § 1983 liability. *Id.* (citing *Pendleton v. St. Louis County*, 178 F.3d 1007, 1011 (8th Cir. 1999)).

211.    To prevail on a First Amendment unlawful retaliation claim, a plaintiff must show that (1) he engaged in a constitutionally protected activity; (2) the defendant took adverse action against him that would chill a person of ordinary firmness from continuing in that activity; and (3) the adverse action was motivated in part by the plaintiff's exercise of his constitutional rights. *See Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014).

212.    "Simply put, professors at public universities retain First Amendment protections at least when engaged in core academic functions, such as teaching and scholarship." *Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021).

213.    "Under the First Amendment, 'the mere dissemination of ideas ... on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Id.* at 506 (quoting *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670 (1973) (per curiam)).

214.    By emailing his students to explain his objections to Policy #1446 on ethical, legal, and medical grounds, Professor Stewart engaged in constitutionally protected activity. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("a teacher's public criticism of his superiors on matters of public concern may be constitutionally protected and may, therefore, be an impermissible basis for termination of his employment.").

215.    Moreover, because Professor Stewart was communicating with students about an issue within the ambit of his teaching and scholarship functions as a philosophy professor, he was engaged in a core academic function, and his speech is correspondingly protected under the First Amendment. *Meriwether*, 992 F.3d at 505.

216.    According to Defendants themselves, this communication with his students constituted one of the bases for Professor Stewart's termination.

217.    Naturally, a person of ordinary firmness would be deterred from engaging in conduct that ultimately results in termination or plays a role in his termination from his place of employment for 30 years.

218.    Accordingly, by disciplining and ultimately firing Professor Stewart for engaging in constitutionally protected speech, LSC Defendants violated his First Amendment rights.

219.    He is therefore entitled to a declaratory judgment acknowledging this First Amendment violation, and injunctive relief—reinstating him to his previously held position at LSC.

### COUNT V: VIOLATION OF THE UNCONSTITUTIONAL CONDITIONS DOCTRINE AND PLAINTIFF'S FIRST AMENDMENT FREE SPEECH RIGHTS 42 U.S.C. § 1983 (LSC DEFENDANTS)

220.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

221.     The government may not deny an individual a benefit "on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry*, 408 U.S. at 597.

222.     This constraint on government applies in the context of public employment. *See id.*

223.     The Supreme Court has held that "a teacher's public criticism of his superiors on matters of public concern may be constitutionally protected and may, therefore, be an impermissible basis for termination of his employment." *See id.* at 598 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

224.     One of the grounds LSC cited for terminating Professor Stewart was his email to his students explaining that he would not be in class to teach them because of his noncompliance with Policy #1446. In that email, he further voiced his objections to and concerns with the policy on civil liberties and constitutional grounds.

225.     This speech, criticizing his superiors on matters of public concern, was constitutionally protected. *See Perry*, 408 U.S. at 598.

226.     Moreover, while LSC Defendants falsely claimed that Professor Stewart had been warned not to contact his students, no such warning was made (and it would have been unconstitutional if it had been made).

227.     Nor, contrary to LSC Defendants' claims, did Professor Stewart violate any policy by sending his students this email.

228.     There cannot be a valid government policy in forbidding a tenured professor from informing adult students of the reason he will not be teaching their class and criticizing the government policy that resulted in that outcome. The First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

229.     While LSC policy prohibited faculty from using their work email for reasons apart from meeting the academic and administrative needs of the College community, Professor Stewart's email explaining his philosophical, moral, legal, and medical objections to Policy #1446 fit within these parameters—meeting the academic and administrative needs of the College community, as his students would certainly want an explanation for his prolonged absence.

230.     Indeed, as a professor of ethics and philosophy, explaining his own reasons for not complying with Policy #1446 provided a real-life lesson to his students in the very subjects that he taught. *See Meriwether*, 992 F.3d at 505.

231.     Contrary to LSC's allegations, Professor Stewart's email did not violate his employer's policy prohibiting conduct that a reasonable person would find inappropriate.

232.     A reasonable person would consider it appropriate to explain to his students why he would not be teaching them for an indefinite period of time.

233.     Moreover, as a professor of ethics and philosophy, it made eminent sense for Professor Stewart to expound upon the ethical and moral objections to Policy # 1446.

234.    So either Professor Stewart did not in fact violate LSC's policy, or that policy created an unconstitutional condition in violation of his First Amendment rights.

235.    Accordingly, Defendants' claim that they were entitled to terminate Professor Stewart for, among other things, articulating his dissent on a matter of public concern to his students, which was his First Amendment right, imposed an unconstitutional condition, and this termination harmed and continues to harm him, as it caused and is causing financial loss and emotional distress. *See Perry*, 408 U.S. at 598.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiff respectfully requests that the Court find the Defendants have committed the violations alleged and described above, and issue in response the following:

A. A declaratory judgment that Policy #1446 infringed upon Professor Stewart's constitutionally protected rights to protect his bodily integrity and to refuse unnecessary medical treatment and continues to cause him harm;

B. A declaratory judgment that Policy #1446 imposed an unconstitutional condition, especially in light of a set of explicit and implicit procedures established in the Policy that violate the Due Process Clause of the Fourteenth Amendment;

C. A declaratory judgment that Policy #1446 violated and continues to violate Professor Stewart's Fourteenth Amendment right to equal protection under the law;

D. A declaratory judgment that, by punishing Professor Stewart for his speech, LSC imposed an unconstitutional condition and/or retaliation and violated the First Amendment, and he continues to suffer harm from this action;

E. Injunctive relief requiring LSC to reinstate Professor Stewart to his original position according to the terms of his UFT employment, as they existed before he was unlawfully terminated;

F. An award to Plaintiff for attorney fees and costs; and

G. Such other relief as the Court finds just and appropriate.

April 9, 2025

Respectfully submitted,

_____*/s/ James V. F. Dickey*_____
Jenin Younes*
Litigation Counsel
(N.Y. Reg. No. 5020847)

Gregory Dolin*
Senior Litigation Counsel
(N.Y. Reg. No. 4326294)

NEW CIVIL LIBERTIES ALLIANCE
4250 Fairfax Drive, Suite 300
Arlington, Virginia 22203
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
jenin.younes@ncla.legal

*Pro hac vice admission pending*

Douglas P. Seaton (MN #127759)
James V. F. Dickey (MN #393613)
UPPER MIDWEST LAW CENTER
12600 Whitewater Dr. Suite 140
Minnetonka, MN 55343
612-428-7000
james.dickey@umlc.org