UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Professor Russell Stewart,<br><br>       Plaintiff,<br><br>v.<br><br>Timothy Walz, Governor of the State of Minnesota, in his official capacity; Patricia Rogers, President of Lake Superior College (LSC) in her official capacity; Linda S. Kingston, Vice President of Academic and Student Affairs at LSC, in her official capacity; Jestina Vichorek, Director of Human Resources at LSC, in her official capacity; Nickoel Anderson, Vice President of Administration at LSC, in her official capacity,<br><br>       Defendants. | No. 25-cv-1330 (KMM/LIB)<br><br>**ORDER** |

    Plaintiff Russell Stewart, a former professor at a public university, was terminated after he refused to comply with a policy requiring state employees to either get vaccinated against COVID-19 or take weekly tests. Mr. Stewart brought this suit alleging that the policy and his resulting termination, which cited both his noncompliance with the policy and an email he sent to his students about the policy after he was disciplined, violated his constitutional rights.

    The matter is now before the Court on Defendants' Motion to Dismiss the Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For

the reasons discussed below, the Motion is denied as to Mr. Stewart's First Amendment claim and granted as to his remaining claims.

## BACKGROUND

Since 1992, Mr. Stewart was employed as a tenured professor at Lake Superior College in Duluth, Minnesota.[1] (Dkt. No. 1 ¶ 10.) He held that position in August 2021, when Governor Timothy Walz, a named defendant in this case, announced a policy that would require state employees at onsite workplaces to either provide proof of COVID-19 vaccination or test for COVID-19 weekly. (*Id.* ¶ 56 & n.14.) Shortly afterwards, the Minnesota Department of Management and Budget (MMB)[2] formalized the policy, which was to take effect on September 8, 2021, and apply to employees of the College. (*See id.* ¶¶ 59, 72; Dkt. No. 1, Ex. A (scope).) Mr. Stewart received an email from the College notifying all its employees that they must comply with the policy. (*Id.* ¶ 72.)

After the policy took effect, Mr. Stewart informed the College that he refused to provide his vaccination status and was withholding consent to the policy. (*Id.* ¶¶ 73–74.) A few weeks later, Defendant Linda Kingston ("Dr. Kingston"), the College's Vice

---

[1] Mr. Stewart alleges that a few years after he began working at the College, he attained an "unlimited full-time (UFT) position," which is "the equivalent of tenure. (Dkt. No. 1 ¶ 2.)

[2] For context, the MMB is "designated as [a] department[] of the state government." Minn. Stat. § 15.01. In their Motion to Dismiss, Defendants argue that Governor Walz should be dismissed as a defendant because he did not himself promulgate the policy that is challenged here, and that argument turns on the MMB's relationship to the Governor. But, as discussed below, the issue of whether Governor Walz is a proper defendant is moot because only Mr. Stewart's First Amendment retaliation claim survives Defendants' Motion to Dismiss, and Mr. Stewart brings that claim only against the defendants that are affiliated with the College. (Dkt. No. 1 ¶¶ 206–19 (Count IV).)

President of Academic and Student Affairs, reached out to Mr. Stewart about his failure to test as required, and she scheduled a meeting "to discuss the policy and the implications of [Mr. Stewart's] failure to comply with it." (*Id.* ¶ 75.) Mr. Stewart replied explaining that he would not comply with the policy because he believed that the Governor and the MMB "had neither the [c]onstitutional nor statutory authority to impose it, as the Governor had no emergency powers at the time." (*Id.* ¶ 76.) He also noted his objection to the policy as being "coercive" and "violative of sacrosanct rights to medical autonomy, bodily self-determination, and privacy." (*Id.*)

Dr. Kingston and Defendant Jestina Vichorek, the College's Director of Human Resources, attended the meeting, along with a union representative. (*Id.* ¶ 77.) To accommodate Mr. Stewart's concerns, the College offered to take additional measures to protect Mr. Stewart's privacy and the confidentiality of his testing data. (*Id.* ¶ 78.) The College also provided Mr. Stewart with a less invasive testing alternative. (*Id.* ¶ 81.) When Mr. Stewart declined the accommodations, Ms. Vichorek told Mr. Stewart that he would be placed on unpaid leave, with his teaching duties to cease immediately, until he complied with the policy. (*Id.* ¶ 83.) Ms. Vichorek noted that the decision "was not a disciplinary measure or termination of . . . employment." (*Id.* ¶ 84.) According to Mr. Stewart, when he asked if he could access his work email, Ms. Vichorek said that it "remained undecided" but did not explicitly instruct him to not use his work email or contact his students. (*Id.* ¶¶ 84–86.)

Later that day, Mr. Stewart used his work email to inform his students that he "ha[d] been placed on no-pay status and excluded from the LSC campus workplace" for his failure

3

to comply with the policy. (Dkt. No. 1, Ex. B.) Directing his students to the policy, Mr. Stewart wrote:

> I am not opposed to vaccines in general or COVID-19 vaccines in particular. However, I believe that [the policy] is unlawful and arbitrary. It is also immoral in that it deploys workplace coercion to undermine the sacrosanct rights of medical autonomy, bodily self-determination, and privacy. The imposition of this policy has demoralized staff and faculty at [the] College has contributed to the damaging polarization that now divides our society.

(*Id.*) Mr. Stewart also explained his belief that Governor Walz and the MMB lacked legal authority to enforce the policy, saying that "[t]he arbitrary whims of politicians and bureaucrats cannot form the basis for civil society, yet that is the direction the state of Minnesota has taken under the Governorship of Tim Walz. It is shameful." (*Id.*) Reiterating that he "refuse[d] to be coerced into doing something that violates fundamental rights," Mr. Stewart concluded by telling his students "to pay attention to the world around you and think hard about what you see and hear." (*Id.*)

One week later, Ms. Vichorek notified Mr. Stewart that the College was conducting a misconduct investigation and had scheduled a disciplinary hearing. (Dkt. No. 1 ¶ 91.) The notification letter referred to both Mr. Stewart's noncompliance with the policy and the email he sent to his students, which was described as a "communication . . . that a reasonable person would not find appropriate" and an "unauthorized use of state property . . . to contact the students enrolled in [Mr. Stewart's] courses to express [his] personal political opinions while representing [the] College." (*Id.*) At the disciplinary hearing, Mr. Stewart "stated that he was aware of [College] policies relating to use of [work] email"

4

but did not believe that his email violated those policies. (*Id.* ¶ 94.) Over the next few months, Mr. Stewart and the College administration had additional conversations and meetings, some of which of which concerned the email. (*See id.* ¶¶ 97–114.) Alan Finlayson, who was the College's Vice President of Administration at the time,[3] was also involved. He issued letters and communicated with Mr. Stewart about his continued suspension, ongoing disciplinary investigations, and noncompliance with the policy. (*Id.* ¶¶ 95–103.) Throughout that time, Mr. Stewart maintained his objections to the policy and did not comply with it, and the College continued to suspend his teaching duties and keep him on unpaid leave. (*See id.*)

In January 2022, as those conversations were ongoing, Mr. Stewart contracted COVID-19. (*Id.* ¶ 115.) He asked Defendant Patricia Rogers, the President of the College, to exempt him from the policy because compliance, either by getting vaccinated or testing, "would force [him] to violate [his] sincerely held religious commitment to the principles of liberty, equality, and consent," and the policy "fail[ed] to account for naturally acquired immunity, which many researchers deem superior to that induced through vaccination." (*Id.* ¶ 119; *see also id.* ¶¶ 120–26 (detailing Mr. Stewart's basis for objecting to the policy).) The College denied his request. (*Id.* ¶ 128.)

On March 1, 2022, after Mr. Stewart had reiterated his request to no avail, President Rogers sent him a proposed discharge letter, which stated that Mr. Stewart would be

---

[3] The Complaint alleges that Alan Finlayson has been succeeded by Nickoel Anderson, who is the current Vice President of Administration at the College and a named defendant in this action. (*See* Dkt. No. 1 at 1 (case caption); *id.* ¶ 15.)

5

terminated on March 11, 2022, and remain on unpaid leave until then. (*Id.* ¶¶ 130–34.) In addition to Mr. Stewart's noncompliance with the policy, the letter cited his email, claiming that he sent it despite explicitly being instructed not to. (*Id.* ¶ 134.) Mr. Stewart's dismissal was upheld, and he brought this suit, alleging that Defendants violated his constitutional rights to due process, equal protection, and free speech, and imposed an unconstitutional condition on his employment by enforcing the policy. (*Id.* ¶¶ 136, 155–56, 181–85, 192–94, 214–16, 218.)

## DISCUSSION

Defendants argue that all of Mr. Stewart's claims should be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. As for Mr. Stewart's due-process and equal-protection claims, Defendants argue that, under rational basis review, "both fail because the [p]olicy was rationally related to legitimate state interests, including, but not limited to, preventing COVID-19." (Dkt. No. 14 at 4, 6.[4]) Defendants also argue that Mr. Stewart's First Amendment retaliation claim fails because his email "was not speech on a matter of public concern and, alternatively, was not a but-for cause of his termination." (*Id.* at 4–5.) And, they seek dismissal of Governor Walz as an improper party "because the complaint does not plausibly allege any causal connection between him and Plaintiff's alleged injuries." (*Id.* at 4.)

---

[4] Unless otherwise indicated, the Court cites to the pagination generated by the CM/ECF filing system.

**I.      Legal Standard**

To survive a motion to dismiss, "a complaint must contain sufficient factual allegations to state a claim to relief that is plausible on its face." *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014) (quotation omitted). The facts alleged in the complaint must "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555). In applying this standard, courts must assume that all factual allegations in the complaint are true and construe all reasonable inferences from those facts in the light most favorable to the nonmoving party. *Cole v. Grp. Health Plan, Inc.*, 105 F.4th 1110, 1113 (8th Cir. 2024). But courts "need not accept as true a plaintiff's conclusory allegations or legal conclusions drawn from the facts." *Ingram v. Ark. Dep't of Corr.*, 91 F.4th 924, 927 (8th Cir. 2024) (quoting *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019)). In short, there must exist "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

Generally, when considering a motion to dismiss, courts "must ignore materials outside of the pleadings[.]" *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). However, courts "may consider some materials that are part of the public record or do not contradict the complaint, . . . as well as materials that are necessarily embraced by the pleadings." *Id.* (citation and quotations omitted). Consideration of these materials does not require a court to convert a motion to dismiss into a motion for summary judgment. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).

## II. Equal Protection

The Equal Protection Clause provides that no state shall deny any person equal protection of the laws. U.S. Const. amend. XIV, § 1. Where, as here, "no . . . suspect class is at issue, a challenged law must pass the rational basis test." *Hughes v. City of Cedar Rapids*, 840 F.3d 987, 996 (8th Cir. 2016).[5] To meet that standard, Defendants "need only show that the differential treatment is rationally related to a legitimate state interest." *Exec. Air Taxi Corp. v. City of Bismarck*, 518 F.3d 562, 566 (8th Cir. 2008) (citing *Vacco v. Quill*, 521 U.S. 793, 799 (1997)). On rational basis review, a law "bear[s] a strong presumption of validity," and its challenger bears "the burden 'to negative every conceivable basis that might support it.'" *Danker v. City of Council Bluffs*, 53 F.4th 420, 423 (8th Cir. 2022) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993)); *see also Let Them Play MN v. Walz*, 556 F. Supp. 3d 968, 980–81 (D. Minn. 2021) ("[T]he Constitution allowed Defendants to make their policy choices based on 'rational speculation unsupported by evidence of empirical data.'" (quoting *Beach Commc'ns, Inc.*, 508 U.S. at 315)).

The Court finds that any differential treatment stemming from the policy was "rationally related to a legitimate state interest." *Exec. Air Taxi Corp.*, 518 F.3d at 566. As courts have repeatedly recognized in cases involving challenges to vaccine mandates and

---

[5] There is no dispute that the rational basis test applies. (*See* Dkt. No. 19 at 31 (agreeing that Mr. Stewart's equal-protection claim is subject to rational basis review because he "is not a member of a suspect class").)

other restrictions during the pandemic, states had an "unquestionably . . . compelling interest" in "[s]temming the spread of COVID-19." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2022). Requiring onsite state employees to get vaccinated or submit to regular testing is rationally related to that interest, and the policy satisfies rational basis review. Even taking Mr. Stewart's allegations about the effectiveness of naturally acquired immunity to the COVID-19 virus to be true, the state's chosen response to the spread of COVID-19 is not irrational. Therefore, Mr. Stewart's equal-protection claim is dismissed.

### III. Substantive Due Process

Next, Defendants seek dismissal of Mr. Stewart's substantive-due-process claim. They urge the Court to apply rational basis review, relying largely on *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). (Dkt. No. 14 at 6–8.) They also argue that rational basis review applies apart from *Jacobson* because Mr. Stewart does not plausibly allege that the policy infringed on a fundamental right by invoking his "right to bodily autonomy." (*Id.* at 8–13.) Mr. Stewart argues that the policy warrants heightened scrutiny because it infringed on his fundamental rights, and *Jacobson* is not applicable here, where the policy was imposed "long after an initial emergency ha[d] passed." (Dkt. No. 19 at 17–19.) Alternatively, he argues that the *Jacobson* Court applied a version of heightened scrutiny when it "considered the significant liberty interest[] at stake"—namely, the plaintiff's "interest in declining the unwanted vaccine against the State's interest in preventing" the spread of disease. (*Id.* at 23.)

9

The Fourteenth Amendment's Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); see *Karsjens v. Piper*, 845 F.3d 394, 407 (8th Cir. 2017) (noting that heightened scrutiny applies when fundamental rights are implicated). Such rights and liberties are those "which are, objectively, deeply rooted in this Nation's history and tradition[.]" *Glucksberg*, 521 U.S. at 720–21 (quotations and citations omitted). Because the appropriate level of scrutiny turns on whether a fundamental right is at stake, a "[s]ubstantive due process analysis must begin with a careful description of the asserted right[.]" *Reno v. Flores*, 507 U.S. 292, 302 (1993) (quotation omitted). If the challenged law does not interfere with a fundamental right, rational basis review applies. *Danker*, 53 F.4th at 423.

Here, Mr. Stewart asserts his "constitutional right to refuse medical treatment,"[6] which raises several problems. To begin, he does not allege that Defendants forced or attempted to force medical treatment on him, and he does not cite any cases where courts have held, in the context of a substantive-due-process claim, that vaccination constitutes medical treatment. *See Glucksberg*, 521 U.S. at 722–23 (noting the Supreme Court's "tradition of carefully formulating the interest at stake in substantive-due-process cases" and clarifying that the "right to refuse lifesaving hydration and nutrition" is not necessarily

---

[6] The Court focuses its analysis on the "right to refuse medical treatment" because it is the most specific articulation of Mr. Stewart's asserted right. Mr. Stewart also describes the right at issue as his "well established, traditional rights to bodily integrity and freedom from unwanted touching." (Dkt. No. 19 at 25.) The phrasing does not change the Court's analysis.

a "right to die"). (Dkt. No. 1 ¶ 175.) In fact, in cases involving challenges to vaccine mandates, courts have uniformly framed the asserted right as a nonfundamental right to refuse a vaccine that does not warrant heightened scrutiny. *See, e.g., We the Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.*, 76 F.4th 130, 156 (2d. Cir. 2023) (stating that the Supreme Court and the Second Circuit have declined to recognize the "absolute freedom from unwanted vaccination" as a fundamental right (citing *Plyler v. Doe*, 457 U.S. 202, 223 (1982))); *Children's Health Def., Inc. v. Rutgers, the State Univ. of N.J.*, 93 F.4th 66, 78 (3d Cir. 2024) ("As federal courts have uniformly held, there is no fundamental right to refuse vaccination."); *Curtis v. Inslee*, 154 F.4th 678, 691 (9th Cir. 2025) ("Under longstanding Supreme Court precedent, the right to refuse a vaccine is not inviolate."). In any event, aside from whether the right to refuse a vaccine is fundamental, the policy at issue here is not a vaccine mandate.[7] Indeed, the policy Mr. Stewart challenges required that he *either* receive a COVID-19 vaccine *or* submit to weekly saliva-based or nasal-swab testing.[8] And he does not point to any decision that holds that requiring non-invasive testing for a communicable disease implicates a fundamental right. Therefore, the Court concludes that the policy warrants rational basis review.

---

[7] *See* Dkt. No. 19 at 24 (referring to the policy as "the Covid vaccine mandate").

[8] In alleging that he has a right to refuse vaccination and testing, Mr. Stewart also cites a state statute recognizing a "fundamental right to refuse," among other things, "testing," "vaccination," and "collection of specimens." (Dkt. No. 1 at ¶ 68 (citing Minn. Stat. § 12.39).) But even if his reading of that law is correct, the fact that Minnesota recognizes certain fundamental rights not guaranteed under the federal constitution is irrelevant to a federal due-process claim.

The Court reaches this conclusion without deciding whether *Jacobson* is controlling here. In *Jacobson*, the Supreme Court upheld a Massachusetts law that permitted cities to enforce a vaccine mandate by assessing criminal fines for noncompliance. 197 U.S. at 13–14, 26–28. There, the plaintiff, who was prosecuted for refusing the smallpox vaccine, argued that the law violated due process by infringing on his fundamental right "to care for his own body and health." *Id.* at 26. While many cases upholding COVID-19 vaccine mandates relied on *Jacobson*, which remains good law, Mr. Stewart correctly points out that the Eighth Circuit has cautioned against the wholesale application of *Jacobson* throughout the pandemic. (Dkt. No. 19 at 19–20 (citing *Heights Apts., LLC v. Walz*, 30 F.4th 720, 726–27 (8th Cir. 2022)).) Given that determining whether *Jacobson* deference is applicable here requires a difficult "factual determination" of when "the immediate public health crisis dissipated," the Court declines to address that question at this early stage. *See Heights Apts., LLC*, 30 F.4th at 727 (noting that *Jacobson* deference applies only during "the immediate public health crisis," after which traditional levels of scrutiny apply).

Having concluded that rational basis review applies, the Court finds that the challenged policy readily satisfies that standard, *see Danker*, 53 F.4th 420 (stating that "[a] rational basis that survives equal protection scrutiny also satisfies substantive due process analysis"), and dismisses Mr. Stewart's due-process claim. Because the only claims asserted against Governor Walz are Mr. Stewart's equal-protection and due-process claims, which are both dismissed, Governor Walz is dismissed from this action.

## IV. First Amendment

All that remains is Mr. Stewart's First Amendment retaliation claim, which he asserts against the defendants who are officials of the College ("LSC defendants"). As an initial matter, Defendants argue that the claim "fails against all [d]efendants except President Rogers, who was the sole decisionmaker for [Mr. Stewart's] termination." (Dkt. No. 14 at 21 (citing *Norgren v. Minn. Dep't of Hum. Servs.*, 96 F.4th 1048, 1057 (8th Cir. 2024)). On the merits, they argue that "the email is not protected speech and did not cause [Mr. Stewart's] termination." (Dkt. No. 14 at 20 (heading to Part III).)

For Mr. Stewart's First Amendment retaliation claim to survive a motion to dismiss, he must plausibly allege that (1) he "engaged in protected activity"; (2) Defendants "took an adverse employment action against [him]"; and (3) "the protected speech was a 'substantial or motivating factor' in that decision to take the adverse employment action." *Noon v. City of Platte Woods*, 94 F.4th 759, 764 (quoting *Henry v. Johnson*, 950 F.3d 1005, 1011 (8th Cir. 2020)). Because there is no dispute that the College's decision to place Mr. Stewart on unpaid leave before ultimately terminating his employment was an "adverse employment action," *id.*, the Court's analysis focuses on whether Mr. Stewart plausibly alleged that he engaged in protected activity when he sent the email to his students and that the protected speech was a "substantial or motivating factor" in his termination. *Henry*, 950 F.3d at 1011.

The Court concludes that Mr. Stewart has stated a First Amendment retaliation claim. Generally, speech on "a matter of public concern" is protected by the First Amendment. *Mayfield v. Mo. House of Reps.*, 122 F.4th 1046, 1053 (8th Cir. 2024).

Criticism of public officials and the administration of governmental policies "lies at the heart of" such protected speech. *Williams v. City of Carl Junction*, 480 F.3d 871, 874 (8th Cir. 2007). Mr. Stewart alleges that he emailed his students "to explain his objections to [the policy] on ethical, legal, and medical grounds[.]" (Dkt. No. 1 at ¶ 214.) That allegation is plausible based on the content of his email. *See Mayfield*, 122 F.4th at 1053 (considering the "content, form, and context of a given statement" in determining whether an employee spoke on a matter of public concern). The email expresses, in relevant part, Mr. Stewart's view that the policy is "immoral," coercive, "demoraliz[ing]" to College staff, and claims that the policy "has contributed to the damaging polarization that now divides our society." (Dkt. No. 1, Exhibit B.) It also contains criticisms of public officials, including Governor Walz and the MMB. (*See id.* (describing "the direction the state of Minnesota has taken under the [g]overnorship of Tim Walz" as "shameful").) Similarly, Mr. Stewart has plausibly alleged that the email he sent was a "substantial or motivating factor" in the decision to terminate his employment. *Noon*, 94 F.4th at 764. According to the Complaint, at least two of the disciplinary letters that Mr. Stewart received from the College cited his email, as did the proposed discharge letter from Defendant Rogers. (Dkt. No. 1 at ¶¶ 91, 96–99, 134.)

Moreover, the Court finds that the LSC defendants—Dr. Kingston, Ms. Vichorek, and Ms. Anderson—are all properly included in the case based on the allegations in the Complaint. Mr. Stewart alleges that each LSC defendant, except for Mr. Finlayson in Ms.

14

Anderson's place,[9] was personally involved in the disciplinary proceedings that ultimately led to his termination. According to the Complaint, Dr. Kingston and Ms. Vichorek attended the disciplinary hearings, and President Rogers sent Mr. Stewart the letter that cited his email as a basis for his proposed discharge. (Dkt. No. 1 ¶¶ 77–78, 81, 83–86, 91, 130–34.) And Mr. Stewart alleges that all of the LSC defendants communicated with him about the College's decisions and the email he sent to his students, both orally and in writing. Taking those allegations to be true, as the Court must when considering a motion to dismiss, *Cole*, 105 F.4th at 1113, the Court finds that Mr. Stewart has plausibly alleged the elements of a First Amendment retaliation claim against the LSC defendants.

On the other hand, the Court concludes that Mr. Stewart has not stated a First Amendment unconstitutional-conditions claim. (Dkt. No. 1 at 44–46 (Count V).) Beyond "prevent[ing] outright prohibitions on speech," the First Amendment "also prohibit[s] the government from imposing unconstitutional conditions that chill or deter speech." *Ark. Times LP v. Waldrip as Tr. of Univ. of Ark. Bd. of Trs.*, 37 F.4th 1386, 1391 (8th Cir. 2022) (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). "The government imposes an unconstitutional condition when it requires someone to give up a constitutional right in exchange for a government benefit." *Id.* (citing *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994)). Here, Mr. Stewart has not alleged that the Defendants conditioned any benefit,

---

[9] *See Kentucky v. Graham*, 473 U.S. 159, 166 n.11 (1985) ("In an official-capacity action in federal court, death or replacement of the named official will result in automatic substitution of the official's successor in office.") (citing Fed. R. Civ. P. 25(d)(1), which provides that "[l]ater proceedings [that occur after a public officer resigns or otherwise ceases to hold office] should be in the substituted party's name").

15

including his employment, on giving up his free-speech rights. Indeed, according to Mr. Stewart, Ms. Vichorek never instructed him not to use his work email or contact his students. (Dkt. No. 1 ¶¶ 84–86.) Only after he sent the email at issue did he face any consequences for doing so, which constitutes retaliation covered by his First Amendment retaliation claim.

## ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED THAT**:

1. Defendants' Motion to Dismiss (Dkt. No. 11) is **DENIED in part and GRANTED in part**.

2. The motion is granted to the extent that Counts I, II (due process), III (equal protection), and V (unconstitutional condition limiting First Amendment rights) of Plaintiff's Complaint are **DISMISSED**.

3. The motion is denied with respect Count IV (First Amendment retaliation).

4. Governor Walz is removed as a defendant.

Date: December 1, 2025         *s/Katherine Menendez*
                               Katherine Menendez
                               United States District Judge